**JOAN R. NUTTALL, Ph. D.**
CONSULTING PSYCHOLOGIST

NORTHBROOK EXECUTIVE CENTER • 10701 W. NORTH AVENUE • SUITE 202 • WAUWATOSA, WISCONSIN 53226 • (414) 771-2450 • FAX (414) 771-2451

July 13, 2007

Ms. Kristin Kiel, Probation Officer
United States Probation and Parole
517 East Wisconsin Avenue
Milwaukee, WI 53203

RE: Dr. Mark Lubinsky
DOB: 03-19-48

Dear Ms. Kiel:

I, Joan R. Nuttall, Ph.D., a licensed psychologist in the State of Wisconsin, do certify that I have seen and examined Dr. Lubinsky on June 15 and 22, and July 6, 2007 at the above address. Purpose was to perform a sex offender evaluation. Several background documents were available for review. A copy of Dr. Lubinsky's curriculum vitae was available as well as a letter from Attorney Dall 'Osto, dated March 6, 2007, a letter from Dr. Carter, dated February 28, 2006, a letter from Dr. Carter, dated September 12, 2005, a copy of a Journal article written by Dr. Lubinsky in 1994 and background information on Compassion Fatigue. Following are the results.

RESULTS OF EVALUATION: Evaluation consisted of extensive clinical interview concerning personal, professional, social and sexual history. Sexual history was partially aided by the Internet Sex Screening Test.

Dr. Lubinsky was raised in New York City as an only child. Father was a civilian Navy worker and mother was a housewife. He grew up in a neighborhood populated primarily by Holocaust survivors. He describes father as socially successful, at ease with people, who never concerned himself with issues like job satisfaction but just did what he had to do. He was generous and somewhat irresponsible. His mother apparently did not work on purpose so that his father would have to be more responsible. He describes mother as somewhat neurotic, always worried about what might happen, nervous, and was treated for depression at one point. Dr. Lubinsky describes himself as "a nerd," liking science and having no interest in sports. He graduated at age 16 from a fast-track public high school.

He describes himself as a very shy child, interested in solitary activities and somewhat socially inept. In high school, his best friend was very popular and he was a good supporting cast. He always liked people and attributed his

2   Lubinsky, Mark

social success to being a good listener and his sense of humor. He always had friends even though he still considers himself to be basically shy. He describes chronic social anxiety, afraid to initiate or be the primary center of attention.

He graduated from college in 1968. He majored in pre-med at his mother's insistence, thinking that being a doctor was a good financial insurance policy. He had never been an attentive student. He could get a "B" by doing nothing. He would do well if he liked the subject and he did well at first in college. In graduate school, he discovered that he hated research and was not good at it. He did not possess the research temperament which required methodical, systematic patience and "mindless" activity. He perceived it as largely luck. He preferred ideas and "thinking about things." He quit after a Master's Degree and went to medical school.

He hated medical school. The atmosphere was "poisonous," where faculty provided no emotional support. Competition was fierce. To his free-thinking mentality, medical school was totalitarian. He experienced the harsh criticism from faculty as "random acts of terror." He tried not to be noticed. He also hated the years of clinical work, the psychological stress of dealing with sick people and feeling unprepared for their problems and always felt lost. Eventually, he decided that he was not stupid or inadequate and also realized that he did not have sufficient courage to quit medical school. He ultimately completed a pediatric residency in Madison and people were supportive, but he was not happy with medicine. He went into genetics as a way to get out of medicine. It was more like nursing, helping to educate people, problem solving, and it was more like counseling. He liked the mixture of counseling and diagnosis and discovered his talent in this area.

He was now 30 years old and took employment in Nebraska at Children's Hospital for 8-10 years. The hospital merged with the university and he became an assistant professor. Although liking the work, it was emotionally destructive, he could not handle the patients' and families' sadness. He could not let things go emotionally and was unable to cope with the enormity of the needs of these families. Looking back now in hindsight, he commented in interview that he had apparently gone to Nebraska thinking that he could save the world. He started feeling that he was a bad doctor because he could not do everything and did not know how to soothe himself. These insights were not developed at that time, although the sadness that eventually enveloped him was building.

Dr. Lubinsky then took employment in California. He was the head of a genetic center with a big pre-natal program and many genetic counselors. He was not happy there and not happy with the way the university connection was set up. When he complained about it, he was told that he had just resigned. He was then unemployed for awhile. His father had died when he was in Nebraska. He completed a fellowship for about a year and started doing some writing. The

next job was for 15 years at the Medical College of Wisconsin. He put all his energy into work and functioning was gradually getting harder and harder. He was not taking care of his home, had problems doing dictation and follow through with patients and his sleep was poor. He gradually gained some weight, starting losing contact with friends and was paying bills sporadically. About seven years ago, he brought his mother to live with him. She had dementia and stopped eating and was placed in hospice care 5-6 months later.

Dr. Lubinsky then buried himself even deeper in his work. He started seeing Dr. Carter and had several unfortunate events that happened at the hospital and problems with hospital administration, cutting off the follow-up with patients four or five years ago. He felt unable to deal with his problems and act on them. He said, "I painted myself into a corner but I couldn't leave. I couldn't let everybody down." He claims now that he did not realize that he needed to stop doing that kind of work. His depression was getting worse. He started taking Wellbutrin four years ago and Prozac 1.5 years ago. It should be noted that there was usually nothing he could do for his patients with their genetic defects, but only help the families cope. He never received any training in therapy techniques, establishing boundaries and other ways to protect himself emotionally from the distress and anguish of patients and families. The eventual psychological self-destruction in these extreme situations was inevitable without such training. This examiner's understanding is that the mortality rate for his patients was approximately 30%, which is almost unfathomable in daily practice for any type of health care provider. He indicated that he is still depressed, but recovering, and still has difficulty getting things done. He is gradually getting in contact with old friends and is once again getting enjoyment from writing.

Sexual history started before age ten, playing with three girls in the neighborhood who were about a year older or his age. This involved "I'll show you mine if you show me yours" activity and lasted sporadically for a couple of years, usually spontaneous. He denies initiating this in the beginning but did later on. It involved some touching of buttocks but nothing genital. He claims that this ended because he had other friends. He recalls one occasion of brief voyeurism when a classmate's girlfriend stayed over at his place and he saw them having sex. He claims that he did not continue watching because "it seemed rude." He denies any occasions of exhibitionism. Some frotteurism was noted when he rode the subway in high school during adolescence. He did it often when he had the opportunity and did experience arousal. He denies telephone sex, any activity with males, bestiality or other paraphilias. He claims that he saw magazine pornography starting before age ten, usually at school. He would bring it home and successfully concealed it. This was around age 12 or 13 and he used this for masturbation. He had no formal sex education coming up through school. When he was eight, he claims his mother gave him a science book on reproduction. He denies any history of sexual victimization. He denies any involvement in sadism or masochism but had one girlfriend briefly who

enjoyed spanking. She expressed interest in bondage but "we never got around to it." He denies any interest or involvement in urinating or defecating as part of sexual activity.

His first direct sexual experience occurred in early high school. This involved hugging and kissing for a couple of years. There was occasionally minor activity in college, making out, but nothing more significant. Because he had graduated from high school so young, he was younger than most of his peers in college and was shy. He claims little sexual experience in college, occasionally seeing an x-rated movie and masturbating two or three times per day, certainly not extraordinary for a male in that age range. He claims he was only interested in sex with women and never considered children to be arousing.

In graduate school, several relationships lasted about four months each. These were "semi-sexual." He denies intercourse. He claims he had a distorted view of women, dating and sex, more from a "Reader's Digest point of view." He believed that women did not want sex and that a good girl would be insulted. He was shy, did not know the rules, and did not discuss sex. His roommate had a number of relationships and Dr. Lubinsky usually knew the woman. At that time, he was having an identity crisis because of his dislike of research. He acknowledged that the lack of sex really annoyed him but he was happy in other ways and had many friends. He apparently compartmentalized his distress. He was concerned but did not think that his lack of a sexual life was hopeless.

His first experience with intercourse occurred in medical school. No relationship lasted more than a few months. He struggled for two years to work out a relationship with a woman that he loved but the events going on in his life at that time were distracting and it was a poor time to have an effective relationship. He claims that he never received any negative feedback about his sexual skills, but admitted that he never invested much into it. He did not have emotional energy. Frequently, the lack of an emotional attraction inhibited him.

During the residency and fellowship in Wisconsin, he had a series of relationships. They were getting more serious, he invested more, but there was no commitment. These ended on good terms. He had a few very brief relationships, mostly friendships that briefly turned sexual. He was not willing to commit to any relationship long term and was not concerned about it because his friends were all getting divorces. He also had doubts about his ability to make a relationship work.

He indicated that relationships may have involved too much closeness. In fact, many of his relationships have been long distance. The longest was two or three years. He never actually lived together with any of these women. In most cases, the women were professionals he met at conventions. He would see them several times per year. Usually, they would just drift apart. One

relationship with a professional ended because he changed jobs and moved. He claims to be on very good terms yet with three of them. Yet, he came close to marriage a couple of times. The relationships crashed because work was too consuming. He was not able to commit to the time and effort needed to establish and maintain a relationship.

He started a relationship with a woman right before he left Madison for Nebraska. Again, he never really made time for this relationship. He was in love with a different woman in Nebraska and talked about getting married but she went back to her former husband. He was devastated and depressed. Then, the woman from Madison moved to Nebraska to be with another boyfriend, broke up and was with Dr. Lubinsky again after about six months. That relationship lasted several years. He wanted to invest in it but he was very depressed from the other relationship. By the time he was again interested, she had lost interest. He had a few relationships over the next several years, lasting six months or a year or more, but "there was no magic." He was never involved with more than one relationship at a time.

During the summer of 2003, Dr. Lubinsky's Internet pornography use began. For the first few months it was only adult porn. He was more and more into his work, more depressed, occasionally having sexual relations with a woman but the relationships lasted only a short time. He started staying in his office for hours on end, being at his office 16 hours out of 24, eating at the Medical College, seeing patients, but otherwise spinning his wheels. He was not doing his dictation and was not doing follow-up. He would read and write. The lack of productivity resulted from general depression level.

He claims his Internet use progressed rapidly. He would masturbate to the images about 25% of the time. He had periods of impotence and these had been occurring for some time. He gradually learned which sites would bring up pornography. Sometimes he found it stimulating but sometimes disgusting. He never went to chat rooms. He explored lesbian pornography early on and also bestiality which he described as "weird." He sometimes was interested in porn involving a pubescent teenager and would find that arousing but discussion never identified that prepubescent females were arousing.

He estimates that he spent more Internet time on other things besides pornography but ultimately would spend about two hours at a sitting searching pornography from one site to another. Once into it, he just kept going. He recalls occasions when he decided not to search pornography sites and would do other things and have no regret. He claims that he only sought out the pornography sites at night. He waited until people went home and he claims this was not hard to do. He described being busy during the day, never thinking about going to the Internet. He never wished he was less busy so he would have more time for it. He went to the Internet only when there were no other

6   Lubinsky, Mark

things going on and he never looked forward to it. He spoke of using the porn to avoid what he "should have been doing." He spent a lot of time trying to figure out how to download, trying to solve the technical problems because he is not particularly computer savvy. He claims he would pull up a lot of material and not even open it. He described wanting to stop, knowing it was wrong, even promising himself that he would not do it again.

After his Internet use for the day was over, he would be upset, but he claims he does not remember how he felt during the usage and seems to have no awareness of the degree to which he was indulging. He was marginally aware of the risk but did not think about it. He does not think he would have cared had he recognized it fully. He indicated that he never purposefully saved anything, and did not realize the images were kept.

    He was anxious and depressed about not getting things done, but all his emotions were jumbled together. He did not consciously reason out what he was doing or focus on anything in particular. He was so burned out and generally anxious. Although he was eating and bathing, his sleep was poor. He sometimes fell asleep while traveling on the road and was not concerned about that. He was not doing professional things, paying bills or seeing a doctor for his foot infection. He started a long-distance relationship with a woman during the summer that the Internet use began. Part of his motivation for the Internet porn use was to sabotage that relationship from his end, thinking that he was not worthy of her. He never intended to inform her of his Internet use but only to make himself unavailable through his own self-loathing.

    He claims he has always preferred the slim body type, but always females with all the secondary sex characteristics. He recalls having had second cousins who were younger than he and he was never aroused by them as he was growing up. He also indicates that he never wore a white coat and did everything he could to avoid doing the physical exams on his patients throughout his career. He never sought opportunities to do exams on children. He claims he saw shots of pre-pubescent children on the Internet in bathing suits which were not particularly sexual but "it was good to see normal children." He claims he never dreams about children. He dreams about women and intimacy more than sexual mechanics. Yet, in a pensive comment, he acknowledges that "there must have been something there" for him to look at the child pornography. This topic was approached on more than one occasion with Dr. Lubinsky. He made the same comment each time and it was clearly a comment made from intellectual logic and not from emotional attachment. He is simply assuming logically that some type of attraction must have been present but he ddid not appear to have any connection to it. The pornography use was discussed at length on the second and third visits with Dr. Lubinsky. At the third visit, he acknowledged that he had a sexual dream about children right after the second visit and found it "disturbing."

He describes progressing from adult pornography to child pornography because "the adult porn wasn't destructive enough." He already felt like he was a bad doctor and had let everyone down, and viewing child pornography gave him even more reason to hate himself. It was also a way for him to thumb his nose at Children's Hospital Administration, since he was desperate to get out of Children's Hospital and didn't know how to quit because he would let people down even more. He was suicidal but had never enjoyed drugs or alcohol. He was not a violent man. He claims that he still does not care what happens to him. Then, he said he did care, but "It is hard to get excited about it." He claims to have friends who care. He said that "they know that I am a better person than I know because I have helped them." He claims that he always thought he recognized the good that he did, but apparently not.

He was ambivalent about his actions after discovery. He claims he never found himself thinking about child porn after he was caught, never thought about how or when he could access it again. He feels ashamed about what he has done and feels guilty. Several times during the interviews, Dr. Lubinsky's depression was apparent and his eyes welled with tears. He was never talking about his own fate when this occurred. He was always talking about his patients and their families. He still grieves. His comment that he still possesses a "reservoir of sadness" was obvious.

<u>Recommendations:</u> At no point during the hours of interview was Dr. Lubinski ever defensive or evasive about the topics of discussion. He was consistently willing to give consideration to possibilities that were clearly not in his best interest. He exhibited more candor by far than is usually seen in persons in his position. These qualities combined with several of the remarks made over the course of the interviews reveal him as a deeply moral individual.

None of the actuarial risk assessment instruments in current usage is appropriate in this case, because the Static 99 and other instruments are not designed for offenses of this nature. Therefore, comments will be made as germaine as possible to the issues at hand, without benefit of actuarial risk data.

Detailed questioning revealed no evidence that Dr. Lubinski is a pedophile. He never denied being a pedophile, and considered it as an option like any other ideas generated in discussion. There was simply no evidence found for it. Still, the child pornography logically must have been soothing on some level, and several possibilities are potentially relevant. There is the obvious avoidance of reality demands but this could--and often was--accomplished by other sorts of nonproductive activity that did not involve illegal pornography. This examiner suspects that he received some soothing from looking at healthy bodies, given the rarity of that experience in his practice and the severe illnesses that were daily faire for him. He indicates that the

8   Lubinsky, Mark

pornography was the most destructive instrument he could find to accomplish the termination of his life as he knew it, without having to engage in any direct, purposeful act to end his physical being. Of course, logically, all he had to do was walk away. His inability to do that is believable within the context of the paralysis of severe depression. That solution would have constituted taking care of himself and there is precious little evidence that he was doing that much at all. Instead, he was destroying his life little by little in different areas of life, and the pornography fits into the same pattern. That consistency makes viewing the pornography as self-destruction a believable concept.

These data do not suggest that Dr. Lubinsky is a threat to children or society. His risk to re-offend is believed to be very low. He remains emotionally fragile and is gradually putting his life back together. He has some enjoyments. It is not clear what sort of professional life he can ever have again, beyond writing or lecturing on genetics. There will never be clinical practice as an option. He is already a man broken in some important ways. He still grieves for his patients and their families and regrets his own human limitations. These data would support a lengthy probation and appropriate monitoring rather than imprisonment. If prison is deemed essential, the unique circumstances of this case would support minimum tenure in a minimum security institution. Background letters indicate fear that he will commit suicide if he is imprisoned. This is viewed as dependent on where he finds himself, and whether he would have access to materials to do his writing and other nurturing professional and personal activity. There is no doubt he would find it to be a struggle.

These comments are offered to a reasonable degree of professional certainty. Thank you for the referral.

Sincerely,

Joan R. Nuttall, Ph.D.
Consulting psychologist

JRN/pm
CC: Atty. Dall'Osto

**JOAN R. NUTTALL, Ph. D.**
CONSULTING PSYCHOLOGIST

NORTHBROOK EXECUTIVE CENTER • 10701 W. NORTH AVENUE • SUITE 202 • WAUWATOSA, WISCONSIN 53226 • (414) 771-2450 • FAX (414) 771-2451

## VITA

NAME: Joan Rae Nuttall
BUSINESS ADDRESS: 10701 West North Ave.
Suite 202
Wauwatosa, WI 53226
Phone: (414)771-2450
Fax: (414)771-2451
E-Mail: jrnuttall@wi.rr.com

## EDUCATION

Ph.D. 1974 Michigan State University, National Science Foundation Traineeship
M.A. 1972 Michigan State University, National Science Foundation Traineeship
B.A. 1970 University of Denver - Phi Beta Kappa, junior year
              Scholars Program
              Woodrow Wilson Fellowship, Honorable Mention
      1978 Clinical internship, Erie County Medical Center, Buffalo, NY - 1 year
      1996 One-year training course in assessment and treatment of sex offenders
              Wisconsin Sex Offender Treatment Network

## EMPLOYMENT

1999-ongoing  Sex offender evaluations and treatment for U.S. Office of Probation and Parole.

1999-ongoing  Evaluation of psychological fitness for gastric bypass surgical intervention, including risk of post-surgical maladjustment, and readiness planning.

1997-ongoing  Evaluation and treatment of juvenile and adult sex offenders. Includes risk assessment and assessment of amenability to treatment. Includes Chpt. 980 evaluations.

1996-2001    Supervision of master's level therapists from Lakeshore Clinic and Wellness Clinic in Milwaukee, WI.

| | |
|---|---|
| 1995-ongoing | National Advisory Council, Professional Academy of Custody Evaluators (PACE). Network designed to discuss custody testing materials in current use and other issues of interest in custody evaluations. |
| 1983-ongoing | Private practice, Milwaukee, WI. Focus is on forensic work, including family and juvenile and children's court, legal/competency evaluations, disability and rehabilitative assessments. Secondary interest in workman's compensation evaluations.<br>Adult, couple and some child psychotherapy.<br>Child assessments from toddlers through teen years for developmental appraisal, conduct disorders, emotional problems, learning disability and other academic problems, attention problems and neurological screening.<br>Assessment of environmental factors and parent-child interaction on child problems. |
| 1988-ongoing | Assessment of dangerousnesss for Chpt.51 proceedings, Milwaukee, WI. |
| 1985-ongoing | Assessment of needs and therapy for chilldren placed in foster care and for families of these children working toward re-unification. |
| 1990-ongoing | Divorce mediation. |
| 1981-2000 | Part-time faculty, Mount Mary College. Teaching abnormal psychology to health care delivery system majors, including occupational therapy, art and music therapy, and social workers. |
| 1978-81 and 1994 and 1999-ongoing | Assessment and therapy for acute and long-term residents in health care facilities. Combination of geriatric and/or trauma victims or physically disabled. In some facilities, provided staff training, including instruction on management of behavioral problems, difficulties rising out of special needs or mental retardation. Staff training on sensitivity to residents with emotional disorders, how to recognize and make appropriate referrals to mental health care. |
| 1985 | Taught graduate seminar in hypnosis, UWM |
| 1978-81 | Under different auspices, assessment and treatment of health care facility residents and outpatient practice, Behavior and Management Consultants., Inc. |
| 1981-83 | Supervising psychologist, Family Therapy Services outpatient clinic. Primarily responsible for quality of outpatient services provided by all unlicensed personnel. Full-time therapy practice as well, working with a variety of adults/couples with a variety of diagnoses. |
| 1978-ongoing | Licensed psychologist in Wisconsin #0742-057. |
| 1980-85 | Adjunct professorship, Dept. of Psychology, UWM. Supervised graduate students. |

1974-77        Assistant professor, Dept. of Psychology, New Mexico State University.
               Responsibilities included teaching a variety of psychology and
               testing courses and chairing the undergraduate curriculum committee.

## ADJUNCT CLINICAL ACTIVITIES

Sept., 1997:   Workshop for attorneys and mental health professionals, in conjunction with Attys. Diel
               and Riser, on divorce and custody in Wisconsin

   1985:       Developed programs for public education for two radio stations in Milwaukee, one on
               depression and one on hypnosis.

   1976:       Research program on relationship of test anxiety, speed of learning, relaxation
               and personality variables.

   1975:       Group leader on interdisciplinary retreat for university staff on employer-employee relations

  1968-69:     Research on relationship between infant developmental rates and variables related to labor
               and delivery. Behavior Development Laboratory
               During same time frame, assisted in infant classical conditioning research

## FUNDING

Grant from Federal Office of Education to Drs. Kent and Nuttall,
"An Intervention for the Training of Competence and Personal Development."

## AFFILIATIONS

Wisconsin Psychological Association
Midwest Psychological Association
National Register of Health Care Providers
National Advisory Council, Professional Academy of Custody Evaluators
Association for the Treatment of Sex Abusers, *both national and state organizations*